**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Michael P. Hollobaugh Sr.,**

*Plaintiff/Counterdefendant,*

**v.**                                                    **Case No. 3:20-cv-495**
                                                          **Judge Thomas M. Rose**

**Pohl Transportation, Inc.,**

*Defendant/Counterclaimant.*

---

**ENTRY AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT, DOC. 25,
GRANTING UNTIL JANUARY 14, 2023, TO AMEND
COUNTERCLAIM.**

---

Pending before the Court is Defendant's Motion for Summary Judgment. Doc. 25.

Because Plaintiff resigned his position by announcing that fact to the Ohio Department of Jobs

and Family Services and applying for unemployment benefits, he has no evidence that Defendant

took an adverse employment action against him. Thus, Defendant's motion will be granted.

After stipulation by the parties, doc. 28, four claims from Plaintiff's First Amended

Complaint (doc. 20) remain: Count 2 asserts disability discrimination in violation of Ohio

Revised Code § 4112, *et seq.*; Count 3 asserts disability discrimination in violation of the

Americans with Disabilities Act, 42 U.S.C. § 12102, *et seq.*; Count 6 asserts unlawful

interference with rights under the Families First Coronavirus Response Act (FFCRA) (Public

Law 116-127, March 18, 2020); Count 7 asserts retaliation. Doc. 20. Defendant counterclaimed,

1

asserting claims of conversion, defamation and tortious interference with business relationships. Doc. 15. Now, Defendant has moved for summary judgment. Doc. 25.

**I. Background**

Defendant Pohl Transportation, Inc. employed Plaintiff Michael P. Hollobaugh Sr. as an over the road truck driver from December 30, 2019, to April 8, 2020. (Doc. 27-1, PageID 557; Doc. 24-25). Defendant is a trucking company that hauls freight for various customers throughout the United States. (Doc. 27-2, at 590). Defendant Brian Pohl is the President and owner of Pohl Transportation. (Id. at 589). Angie Deeter is Pohl Transportation's Safety Director, Travis Gilbert is the Operations Manager, and Rick Wyatt is the VP Operations/General Manager. (Id. at 592; Doc. 27-1, at 551, 557). All four individuals had authority to terminate Hollobaugh's employment. (Doc. 27-2, at 590).

Hollobaugh's duties included: loading and unloading trailers; lifting, pulling, pushing, and carrying freight; and driving trucks to destinations in accordance with Federal regulations. (Doc. 27-4). Hollobaugh was qualified for his position and could perform the functions of his job. (Doc. 27-1, at 552-53).

In the four months Hollobaugh worked for Defendant, he was disciplined once. (Doc. 24-9). Hollobaugh suffers from depression, PTSD, and diabetes. (Doc. 24, at 202-203). He told Defendant about his diabetes. (Id. at 217-18, 305; Doc. 24-20; Doc. 24- 22). Moreover, Hollobaugh's wife, Ashley, has colon and breast cancer, and she suffers from epilepsy. (Doc. 24, at 190). Hollobaugh informed Defendant of his wife's medical issues. (Id. at 288-89, 298-99).

During his employment, Hollobaugh had to take several days off work due to either his or his wife's medical issues, including doctor appointments, hospital stays, and surgery. (See Doc.

2

24-19, at 464). When Hollobaugh called Defendant to request the days off, he told the dispatcher his reason for the request and told them about his or his wife's medical issues. (Doc. 24, at 288-89, 298-99).

Hollobaugh even "tried to explain to [Brian Pohl] about the cancer, diabetes, and everything, and he just didn't want to listen." (Id. at 305). Eventually, Hollobaugh's requests became an issue, and on March 25, 2020, Gilbert told Hollobaugh, "If you take another day off, Pohl [will] consider it a resignation." (Id. at 314, 317). On March 26, 2020, Hollobaugh spoke with Deeter, and he raised concerns about COVID-19 and how it could affect him due to his diabetes. (Doc. 27-1, at 550, 564). "He was concerned that he was at high risk for contracting COVID and that he shouldn't be driving." (Id. at 550).

Plaintiff acknowledges that Defendant always approved any time off he requested for doctor appointments. (Hollobaugh Depo. 142; Deeter Decl. ¶3.) Plaintiff had absences on March 4 and March 30, 2020, related to doctor appointments for himself or his wife. (Hollobaugh Depo. 103-4; 138-9). Defendant accommodated Plaintiff's absence on March 4 by sending another driver, who picked up the truck and completed an unfinished delivery. (Hollobaugh Depo. 110.) On March 30, Plaintiff attended an appointment with his wife, and Defendant approved and accommodated this absence as well. (Hollobaugh Depo. 139.)

Hollobaugh had previously raised concerns to Gilbert about delivering freight to COVID-19 "hotspots" around the country, which would increase his exposure to the virus, but Gilbert told him he would have to go wherever they sent him. (Doc. 24, at 381). With Deeter, Hollobaugh had at least two conversations regarding his medical issues and his concerns about COVID-19. (Doc. 24-20). Specifically, Hollobaugh "wanted to make sure we are aware he is

diabetic and is at risk to contract the virus." (Id.). In response, Deeter told him "if he chose to self-quarantine then he would not be eligible to be paid for staying home." (Id.). Deeter also warned in an email to Rebecca Pohl-Liette (HR), Brian Pohl, Rick Wyatt, and Travis Gilbert – all members of HR or management – "I have a feeling he is going to continue to make this a pressing issue." (Id.).

Following that discussion with Deeter, Hollobaugh spoke to a former Pohl Transportation employee, Tim Dempsey, and he learned about the federal Pandemic Unemployment Assistance ("PUA") program, which provided temporary benefits to individuals who could not work for certain COVID-19 related reasons. (Doc. 24, at 312-13, 326). Specifically, Pandemic Unemployment Assistance program covered people not otherwise eligible for regular Unemployment benefits and who "are able to, and available for, work…except you are…unable/unavailable to work in one of these situations…You can't reach your place of employment because your health care provider advised you to self-quarantine due to COVID-19." *Id.*

Hollobaugh, who was employed, was not entitled to unemployment benefits, but he was unable/unavailable to work due to his doctor advising him to self-quarantine. Hollobaugh knew he would need income; he had already been told by Deeter he would not be paid if he took off work to quarantine. (Doc. 24, at 314, 326). Accordingly, on March 28, Hollobaugh applied for benefits under the PUA program. (Doc. 24-21). Hollobaugh indicated on his application that he was "resigning" from Pohl Transportation for "health related" reasons. (Hollobaugh Depo. 145, 148.) The paperwork from Ohio Department of Jobs and Family Services reads, "Quit-Health Related." (Doc. 24-21, at 468).

4

On April 2, 2020, a few days after reporting his resignation to Ohio Department of Jobs and Family Services, Plaintiff went to his primary care physician, Dr. Luke Jesser, and obtained a note supporting a leave of absence from work through June 1, 2020, due to his underlying medical condition. (Hollobaugh Depo. 131, 153, Ex. 23.) Plaintiff did not have COVID but was avoiding contact with others as a precaution. (Hollobaugh Depo. 131-2.)

> Q.    Now, by this time you had already filed an unemployment application, but you were calling dispatch by Monday afternoon reporting your schedule for the rest of that week, right?
>
> A.    Yes.
>
> Q.    Why did you do that if you had already applied for unemployment?
>
> A.    As I said, I wasn't quitting at that time.
>
> Q.    Even though you had told [Ohio Department of Jobs and Family Services] that you were quitting by that time, right?
>
> A.    I guess so.

Hollobaugh Depo. at 150.

Hollobaugh insists he never intended to quit, nor did he tell anyone at Pohl Transportation he was resigning. (Doc. 24, at 331-32; Doc. 27-1, at 553; Doc. 27-3, at 614). But, under Ohio law, applying for unemployment benefits triggers a notification to the employer, who must respond within 10 business days and may contest the employee's description of the circumstances of his departure. Ohio Rev. Code §§ 4141.28(B) and (C), 4141.18, 4141.24 and 4141.29 (A)(4)(a)(i)

The Families First Coronavirus Response Action, 29 U.S.C. § 2601 et seq. ("FFCRA") became effective the same day Plaintiff obtained his doctor's note, April 2, 2020. Among other provisions, the FFCRA required certain employers to provide up to two weeks of paid leave to employees who were instructed to quarantine by a physician related to the pandemic. (FFCRA §§ 5102(b)(2)(A).) The cost associated with this paid leave could be recouped in its entirety by employers, as the FFCRA authorized participating employers to deduct and keep an equal amount from payroll taxes that had already been withheld from all employees' paychecks. (FFCRA § 7001(a); see Deeter Decl. ¶10.) Defendant routinely processed and facilitated paid leaves under the FFCRA for at least five other employees during the time it was in effect. (Deeter Decl. ¶16.) Defendant was fully reimbursed by taxpayers for providing this mandatory benefit; according to Congress' design, the Company had no financial disincentive for granting this leave. (See id.; FFCRA § 7001(a).)

On April 6, 2020, Hollobaugh sent Defendant the note from Dr. Jesser, prescribing a period of quarantine until June 1, 2020, "due to his underlying medical conditions and increased risk of developing severe COVID-related complications." (Doc. 24-23). That same day, he also spoke with Jackie Watkins (Driver Manager) to let Defendant know "he can[]not go back out until June 1st due to him being diabetic he is high risk to catching the Corona virus." (Doc. 24-22; Doc. 27-1, at 557). Hollobaugh told Watkins, "he is not quitting he is just following doctors (sic) orders…." (Doc. 24-22).

Defendant agreed to accommodate Plaintiff's medical request. (Hollobaugh Depo. 202.) Defendant told Plaintiff he would need to return his Company-owned truck during his leave, but

Defendant expressed that Plaintiff was welcome to return to work once his leave ended on June 1. (Hollobaugh Depo. 154-6; Deeter Decl. ¶5.)

On April 8, 2020, Ohio Department of Jobs and Family Services conveyed to Defendant Plaintiff's request for unemployment benefits, including Plaintiff's stated reason for his claim: "Claimant's stated reason for separation was: Quit - Health Related." (Hollobaugh Depo. 158-9; Ex. 21, ¶7.) Plaintiff's resignation was effective March 28, 2020. (Hollobaugh Depo. 149; Deeter Decl. ¶6, Ex. A.) Plaintiff acknowledges that this chain of events led Defendant to believe that he had quit his job: his "only dispute" today is that "they did not call me to ask me if I was actually quitting." (Hollobaugh Depo. 149.)

Defendant processed the Ohio Department of Jobs and Family Services notification on April 8, 2020, the same day it was received. (Hollobaugh Depo. 161, Ex. 25; Deeter Decl. ¶8, Ex. B.) Defendant took Plaintiff off the payroll, and certain debts he had incurred to the Company were deducted from his final paycheck pursuant to written authorization from when he was hired. (Hollobaugh Depo. 70; Deeter Decl. ¶9.)

Also on April 8, 2020, Defendant sent a coworker to Plaintiff's home in Pennsylvania to pick up its Company-owned truck, as previously arranged. (Hollobaugh Depo. 161-4, Ex. 26; Deeter Decl. ¶10.) The coworker reported to management that the Company-issued mattress Plaintiff used for sleeping on long trips was missing. Defendant claims it had to reimburse the coworker for a hotel stay that night, because he had nowhere else to sleep. (See Hollobaugh Depo. 161-4, Ex. 26; Deeter Decl. ¶11, Ex. C.) Defendant tallied the expenses associated with several Company-owned items it believes were missing from the truck after it was recovered. Defendant claims these included the missing mattress, a mattress cover, two CB radio antennas,

containers of motor oil, and an oil pan. Hollobaugh denies any of these items were missing. He claims the two antennas belonged to him, as he had Defendant's mechanics remove the standard antennas and install his personal antennas on the truck. (Doc. 24, at 233-34). Plaintiff claims the mattress was in the truck when it was retrieved on April 9, 2020, and it never had a mattress cover with it. (Id. at 237, 240). Hollobaugh purchased the two gallons of oil himself, and the truck never had an oil pan. (Id. at 238-39). The value of these items totaled $368.30. (Id.). Hollobaugh was charged for those items, and that amount was deducted from his final paycheck on April 14, 2020. (Doc. 24-4).

Pohl and Deeter testified they are not aware of any monies owed to Defendant by Hollobaugh. (Doc. 27-1, at 554; Doc. 27-2, at 595). After seeing the deductions, Hollobaugh sent an email to Renee Luthman of Pohl Transportation's payroll that same day stating,

> I didn't quit, I'm on a dr ordered lay-off until June 1st, at which time I am able to return to work. I'm a diabetic and am at very high risk of catching covid19, so my dr ordered me off until then. If you were told that I quit or was terminated then I'd like to know about it. Thank you!

(Doc. 24-27)(sic).

Following Luthman's explanation about why the money was deducted, Hollobaugh wrote, "I was just wondering if they told you that I quit or terminated me or anything because I found that odd." (Id.). Luthman did not respond. Indeed, nobody from Pohl Transportation ever told Hollobaugh he had been terminated. (Doc. 24, at 354). It was not until May 19, 2020 – when Hollobaugh tried to purchase medication and his insurance had been canceled – that Hollobaugh learned he was no longer employed with Defendant. (Id. at 350).

On December 14, 2020, Hollobaugh filed suit. Doc. 1.

8

II.     **Standard**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,*

9

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III.    Analysis

## A.    Discrimination under the Ohio Civil Rights Act and the ADA (Counts II & III)

"Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Merendo v. Ohio Gastroenterology Grp., Inc.*, No. 2:17-CV-817, 2019 WL 955132, at *6 (S.D. Ohio Feb. 27, 2019) (quoting *Olmstead v. L.C. ex. Rel. Zimring*, 527 U.S. 581, 600, 119 S.Ct. 2176, 144

L.Ed.2d 540 (1999)). For this reason, "Title I of the [ADA] prohibits 'covered' employers from 'discharging' an employee because the employee is disabled, because the employee has a record of being disabled, or because the employer 'regards' the employee as disabled." *Babb v. Maryville Anesthesiologists, P.C.*, 942 F.3d 308, 318 (6th Cir. 2019) (quoting 42 U.S.C. §§ 12102(1), 12112(a)). Federal courts generally analyze the ADA and Ohio law in the same manner. See *Columbus Civ. Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573; 697 N.E.2d 204 (1998); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).

"There are two ways that a litigant can prove discrimination—directly or indirectly— each with its own test." *Hall v. U.S. Cargo & Courier Serv., LLC*, No. 2:16-CV-330, 2019 WL 2423054, at *8 (S.D. Ohio June 10, 2019) (quoting *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018)). "Because discriminatory intent is seldom evidenced by overt actions and direct evidence, plaintiffs are more likely to [utilize] the *McDonnell Douglas* evidentiary framework to establish a *prima facie* case." *Mannion v. Lake Hosp. Sys., Inc.*, 2016-Ohio-8428, ¶ 25 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

A plaintiff can establish a *prima facie* case of disability discrimination with indirect evidence by proving that: (1) he is disabled; (2) he is otherwise qualified for his position; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know of his disability; and (5) similarly situated employees outside of the protected class were treated better, or the plaintiff's position was filled by someone outside of the protected class. *Scott v. FirstMerit Corp.*, 167 F. App'x 480, 487 (6th Cir. 2006); *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999).

11

"To establish a *prima facie* case of employment discrimination or retaliation based on race, disability, age, or plaintiff's protected conduct, the plaintiff must present evidence demonstrating, *inter alia*, that the defendant subjected the plaintiff to an 'adverse' employment action." *Reddy v. JPMorgan Chase Bank, N.A.*, 2013 U.S. Dist. LEXIS 86202, *29 (S.D. Ohio 2013). The Sixth Circuit defines an adverse employment action as a "materially adverse change in the terms and conditions of her employment because of her employer's conduct." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).

"A voluntary resignation would not constitute an adverse employment action taken by an employer against an employee, but an involuntary termination of employment would." *Sturgeon v. Southern Ohio Med. Ctr.*, 2011 U.S. Dist. LEXIS 135469, *20, 22-3 (S.D. Ohio 2011). To "resign" is "To formally announce one's decision to leave a job or an organization." RESIGN, Black's Law Dictionary (11th ed. 2019).

When an employee voluntarily resigns, he cannot claim that he suffered an adverse employment decision under the ADA or the FMLA. *Hammon v. DHL Airways, Inc*., 165 F.3d 441, 447 (6th Cir. 1999) (citing *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998). Therefore, the Court must determine whether Plaintiff voluntarily resigned.

The ADA does not define the term resignation. The Sixth Circuit has held that when an employment law statute is silent as to a term's meaning, courts should identify the disputed term's meaning as it is defined under common law principles of agency and the master-servant relationship and incorporate that definition of the term into the statute. See *Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir.1998) (citing *Nationwide Mut. Insur. Co. v. Darden*, 503 U.S. 318, 319, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). In Ohio, definitions of employment

relationships are defined using principles in contract and agency law. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999) (citing *Henkel v. Educational Research Council*, 45 Ohio St.2d 249, 344 N.E.2d 118 (Ohio 1976)).

Ohio common law outlines two kinds of voluntary resignation: "constructive resignation" and "effective resignation." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999) (citing *Rieke v. Hogan*, 138 Ohio St. 27, 32 N.E.2d 9, 10 (Ohio 1941)). An employee can "constructively resign" by failing to comply with his employer's written request requiring him to take a certain action, or by constructively abandoning his position, that is, by failing to report to work for a substantial period of time. *Id.*

The second form of voluntary resignation is "effective resignation." *State ex. rel. Dwyer v. City of Middletown*, 52 Ohio App.3d 87, 557 N.E.2d 788, 793 (Ohio Ct. App. 1988); see also, *State Employment Relations Bd. v. Ohio State Univ.*, 36 Ohio App.3d 1, 520 N.E.2d 597, 599 (Ohio Ct. App. 1987). An employee must take two steps in order to "effectively resign." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999) (citing *State Employment Relations Bd.*, 520 N.E.2d at 599). First, the employee must express an "intention to resign." See *id*. Second, the employee must take some action to demonstrate that he is relinquishing his position. See *id*. The employee may take the two actions simultaneously; however, he must take both actions before an "effective resignation" is complete. See *id*; see also *Dwyer*, 557 N.E.2d at 793.

Absent a valid enactment or contract providing otherwise, acceptance of a resignation is not required to make the resignation effective. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999). A resignation therefore takes effect upon the date specified in the resignation,

13

*Hamm v. Santa Ana*, 273 Cal.App.2d 84, 78 Cal. Rptr. 102 (1969), and cannot be withdrawn after its effective date. *Smith v. Brantley*, 400 So.2d 443 (Fla. 1981); *Hamm*, supra; *People ex rel. Coker v. Owen*, 116 Ill. App. 3d 506, 71 Ill. Dec. 867, 451 N.E.2d 1021 (Ill. App. 1983); see also *Britton v. City of Trinidad*, 687 P.2d 523, 525 (Colo. App. 1984)

Although Plaintiff asserts throughout the Amended Complaint that Defendant involuntarily discharged him, the record is uncontested that he resigned. Plaintiff expressed his intent to resign to the Ohio Department of Jobs and Family Services, who relayed it to the Defendant. Applying for unemployment benefits was an action demonstrating that he was relinquishing his position.

Defendant makes an alternative argument that Plaintiff is estopped from retracting his resignation once Defendant acted on his announcement. In Ohio "The acts and admissions of a party, in general, will operate against the party by way of estoppel only where, in good conscience and honest dealing they ought not to be permitted to deny them." Ohio Jurisprudence 3d, "Estoppel and Waiver" § 33 (2021).

> Equitable estoppel is sometimes said to be a question of morals or ethics. Speaking generally, there must be some element of wrong in the action of the party against whom the estoppel arises – some wrong or advantage taken by the party, by an attempt to defraud, to mislead, or to deceive, or some degree of turpitude in such party's character, particularly since equitable estoppel is called into existence only for the prevention of wrong and the redress of injury.

Id. at § 33.

That Plaintiff tendered his resignation to the Ohio Department of Jobs and Family Services and not directly to Defendant is not material to the effect it had on Defendant:

14

> [I]t is not essential in all cases that the representations should be made directly to the person claiming the estoppel. It is sufficient if they are made to a third person to be communicated to such party or to a class of persons of whom the party is one, or even if they are made to the public generally with a view to their being acted upon, and the party, as one of the public, acts thereon and suffers damage thereby.

Id. at § 40.

As Plaintiff resigned effective March 28, 2020, and Defendant accepted his resignation after learning of it, there was no "adverse employment action." Accordingly, Plaintiff cannot make a *prima facie* case of disability discrimination. Even if he could, Defendant's belief that Plaintiff had resigned effective March 28, 2020, was a "legitimate business reason" for processing his termination, and Plaintiff has not adduced evidence that this reason was pretextual. See *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Byrnes v. LCI Communication Holdings Co*., 77 Ohio St.3d 125, 128 (1996). Summary judgment will be awarded to Defendant on this aspect of Counts II and III.

Counts II and III also allege that Plaintiff suffered discrimination because of his "association" with his disabled wife. (Amended Complaint ¶¶ 52, 68.) The Amended Complaint alleges that in early 2020,

> Hollobaugh had to take off multiple days due to his wife's disability. … Despite Hollobaugh's notice to Pohl of the medical reasons for his absences, his job was threatened repeatedly … for taking the time off for his wife's disability. Brian Pohl also said that, because Hollobaugh was missing work for his wife's disability, that he was "not a truck driver."

Amended Complaint at ¶¶21-22. These allegations are insufficient to survive summary judgment based on an "association" analysis under the ADA.

15

Ohio law does not recognize associational disability claims within the ambit of Ohio Revised Code § 4112. *Smith v. Hinkle Mfg., Inc*., 36 F. App'x 825, 830-31 (6th Cir. 2002). Under the ADA, associational discrimination claims are not viable where an employer is merely concerned with the impact a non-employee's health has on employee attendance:

> As [Plaintiff Overley] does not suffer from a disability, her claim arises under a provision of the ADA that forbids discrimination against "a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Put another way, Overley is claiming that she was fired because of her daughter's disability. *** Unlike a claim brought by a disabled person, an employer is not required to reasonably accommodate an employee based on her association with a disabled person. 29 C.F.R. Pt. 1630, App. (§ 1630.8); *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1084-85 (10th Cir. 1997). Thus, Overley cannot claim that Covenant discriminated against her by not granting her sufficient time off or allowing her to modify her schedule so that she could care for her daughter. An employee who cannot meet the attendance requirements of her job is not protected by § 12112(b)(4). … [N]othing in the ADA allows an employee to miss a shift without an excuse, whether or not the person is associated with a disabled individual.

*Overley v. Covenant Transport, Inc.*, 178 F. App'x 488, 493-4 (6th Cir. 2006).

Protected time off for employees needing to care for the serious health conditions of family members is the province of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq*. As Plaintiff had less than a year of employment with Defendant, he was never eligible for the separate protections available under the FMLA. See 29 U.S.C. § 2611(2)(A)(i). Plaintiff's Response does not address at all the assertion that his claim for "associational" discrimination related to his wife's alleged disability is legally insufficient. (See Doc 29.) This claim is waived.

16

Taking Plaintiff's allegations as true, his "association" disability claim under the ADA will be dismissed. Every allegation of "associational" discrimination in the Amended Complaint is expressly tied to Defendant's alleged concerns about Plaintiff "missing work for his wife's disability." These allegations cannot support a viable ADA claim as a matter of law.

**B.    FFCRA Interference (Count VI)**

In addition to his public policy claim based on the FFCRA in Count V, Plaintiff asserts a separate direct action under the FFCRA in Count VI. Congress enacted the FFCRA on March 18, 2020, in response to the issues facing employees and the general public as a result of the COVID-19 pandemic. Among its many provisions, the FFCRA included the Emergency Paid Sick Leave Act ("EPSLA"), which required employers to provide up to 80 hours of paid sick leave to employees in certain circumstances. FFCRA §§ 5102(b)(2)(A), 5104(1). These included any employee that "has been advised by a health care provider to self-quarantine due to concerns related to COVID-19." FFCRA §§ 5102(a)(2). Employers were prohibited from "discharge[ing], disciplin[ing], or in any manner discriminat[ing] against any employee who … takes leave in accordance with the Act." FFCRA § 5104. The EPSLA took effect on April 2, 2020 and expired on December 31, 2020. See FFCRA §§ 5108-5109. The Department of Labor observed a temporary period of non-enforcement for the first 30 days after the FFCRA took effect, so long as employers acted reasonably and in good faith to comply with the new law. See DOL Field Assistance Bulletin No. 2020-1 (March 24, 2020). The DOL itself did not promulgate a Final Rule providing temporary regulations to implement the EPSLA until April 6, 2020. See 85 Fed. Reg. 19326 (Apr. 6, 2020).

Defendant asserts it was prepared to provide Plaintiff with up to 80 hours of paid leave to the same extent it provided this benefit to its other eligible employees at the time Defendant received and approved his request for time off. But just two days later, before its next payroll, Defendant received Plaintiff's resignation from the Ohio Department of Jobs and Family Services, effective March 28, 2020. (Deeter Decl. ¶16.) Plaintiff's resignation therefore came before the effective date of the FFCRA statute. Plaintiff could not be eligible for statutory benefits that were not yet effective when he resigned.

Defendant's internal records reflect that Plaintiff's request for two months of leave was granted. Assuming he would have qualified, Defendant had no reason not to process the paperwork to pay for his already-approved leave and recover 100% of this benefit from the government. (See FFCRA § 7001(a).) There is no evidence of discrimination related to Plaintiff's request for leave, but it is uncontested that Defendant relied on Plaintiff's own statement that he quit effective March 28, 2020. Plaintiff cannot claim he was involuntarily terminated, let alone because he asked for FFCRA leave.

## C. Retaliation (Count VII)

Count VII asserts "retaliation" for Defendant's filing of a Counterclaim. Hollobaugh originally filed his Complaint in this case on December 14, 2020. (Doc. 1). Defendant was served March 9, 2021 and filed its Answer on May 7, 2021. (Doc. 6). Defendant then waited until August 20, 2021, to file its Motion for Leave to File Amended Answer and Counterclaim, which was ultimately granted on August 24, 2021. (Doc. 10, 12). Defendant then filed its counterclaims on September 2, 2021.

18

In order to determine that the filing of a counterclaim qualifies as an adverse employment action, the Court must find that:

> (1) [defendant] "acted with retaliatory motive," and (2) [defendant's] counterclaims "lack a reasonable basis in fact or law." *Lynch v. Studebaker*, 875 N.E.2d 964, Ohio App. 2007) (quoting *Nestle Ice Cream Co. v. N.L.R.B.*, 46 F.3d 578, 585 (6th Cir. 1995)).The fact that an employee files a charge of discrimination does not immunize such employee from suit brought by the employer, provided that the employer's motivation is not one of retaliation. *Rosania v. Taco Bell of Am., Inc.*, 303 F. Supp. 2d 878, 888 (N.D. Ohio 2004). Moreover, the Seventh Circuit has stated that "[W]e hasten to add, however, that it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation prohibited by these statutes. *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998).

*Aday v. Westerfield Ins. Co*., 486 F.Supp.3d 1153, 1166 (S.D. Ohio 2020) (McFarland, J.).

In the Sixth Circuit, "retaliatory counterclaims that have survived a motion to dismiss in this context have been found to include sufficient factual allegations that the counterclaim was brought in bad faith or without any basis in law or fact." *Sharqawi v. The Kirby Co.*, 2022 U.S. Dist. LEXIS 76044, *10 (N.D. Ohio, April 26, 2022). In this case, Defendant's Counterclaim for defamation and missing property represent legitimate claims. They are supported by contemporaneous witnesses and documentation, and by Plaintiff's own admissions. For example, the fact that Plaintiff was dishonest about his anonymous social media defamation in his interrogatory responses (Ex. 31, Interrogatory 17) and initially in his deposition (Hollobaugh Depo. 195), before finally admitting the truth on cross-examination (Hollobaugh Depo. 196), shows he is aware of and concerned about his own liability. Likewise, third-party coworkers reported missing equipment to management following Plaintiff's resignation.

In his defense to the Counterclaim, Plaintiff has attempted to explain the missing equipment and his defamatory comments, but he has no evidence that these claims were raised by Defendant in anything but good faith. As there are no facts in the record rebutting Defendant's good faith, Plaintiff's retaliation claim fails as a matter of law.

### D.     Counterclaims

What remains are of this dispute are Defendants' counterclaims. The first counterclaim asserts Conversion. Pohl seeks recompense for the $368 of equipment that may be missing from the cabin of the truck. The second counterclaim, for defamation, and the third counterclaim, tortious interference with business relationships, stem from the same allegation. Defendants allege Hollobaugh interfered with Pohl's relationship with its employees and prospective employees by, among other things, wrongfully dissuading them from working or continuing to work with Pohl.

On August 4, 2020, Hollobaugh directed his web browser to Indeed.com and wrote a review of his former employer. Hollobaugh composed the following review:

> The company is terrible
> OTR Company Driver (Former Employee) - Versailles, OH -
> August 4, 2020
>
> This company is a terrible company to work for. They push loads
> on you without checking your hos,(hours of service). They also do
> not respect you as a person if you have a disability such as diabetes
> and you need to stay out of certain hot spots due to the pandemic.
> If your doctor gives you a doctors excuse saying that you are to be
> off for a certain amount of time. This company will wrongfully
> terminate you, which has happened to myself. They pay $.50 cpm
> for all dispatches miles whether you drive those miles or take a
> different route. Which does not pay for your time. They also
> consider themselves essential when they're not, just because they
> haul dog food. They make you sign a form that if you drive the

20

truck on home time that they'll take $50 out of your paycheck and
then they don't honor their word.

> Pros
> Your own truck

> Cons
> Say that you're not a truck driver and numerous other things.

Was this review helpful?
Yes    No

Hollobaugh Depo. at 196; Doc. 24-32, PageID 504. When Pohl printed their exhibit, no user of

Indeed.com had rated the review as helpful or not. To date, only one Indeed.com reader has

found it helpful, while many of the other 21 reviews, many containing glowing reviews, have

accumulated multiple "helpful" reviews from readers.

Pohl's Counterclaim states:

1.  Pohl is an Ohio corporation with its principal place of business
    in Ohio.

2.  On information and belief, Mr. Hollobaugh is an individual
    currently residing in Pennsylvania.

3.  The events giving rise to this Counterclaim took place in Ohio.

4.  Mr. Hollobaugh filed his Complaint against Pohl in this action
    on December 14, 2020. This Court has proper jurisdiction, or
    supplemental jurisdiction, over the parties and subject matter of
    this Counterclaim, and venue is appropriate.

Doc. 15, PageID 121.

Prior to the resolution of Plaintiff's claims against Defendant, it appeared appropriate for

the Court to exercise supplemental jurisdiction over Defendants' counterclaims pursuant to 28

U.S.C. § 1367(a). Even if all of the items from the truck were converted at the value Defendant

21

alleges, if the Indeed.com posting did not damage Defendants beyond $74,632, (and Defendants do not allege that it did), Defendants' counterclaims are now subject to the possibility of dismissal without prejudice under 28 U.S.C. § 1367(c). ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction"); *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004) (although dismissal is not mandatory because supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right, "[g]enerally, if the federal claims are dismissed before trial, the state claims should be dismissed as well") (internal quotation marks omitted).

While there is a split of authority regarding whether the aggregation of the amount of a compulsory counterclaim and the plaintiff's claims may satisfy the amount in controversy. "'the traditional rule has been that no part of the required jurisdictional amount can be met by considering a defendant's counterclaim' to satisfy the amount in controversy requirement" for removal. *Sanford v. Gardenour*, 225 F.3d 659 (6th Cir. 2000) (unpublished) (citing *Wright & Miller*, 14C Fed. Prac. & Proc. Juris. 3d 3725 (1998)). If the aggregation of the damages of a compulsory counterclaim and the damages of a plaintiff's claims is an insufficient independent basis for removal, see id.; and *Strategic Mktg. & Rsch. Team, Inc. v. Auto Data Sols., Inc*., No. 2:15-CV-12695, 2018 WL 11199011, at *1 (E.D. Mich. Jan. 12, 2018); and *Daybreak, Inc. v. Friedberg*, No. 2012-76, 2013 WL 1831660 (D.V.I. May 1, 2013), Defendant's counterclaim appears to arise from a separate incident, separated by time and events from the end of Plaintiff's employment.

Therefore, the Court dismisses the remaining claims without prejudice to refiling them in state court. *Booker v. City of Beachwood*, 451 F. App'x 521, 522-23 (6th Cir. 2011) ("Once [a]

district court dismisse[s] all of the claims over which it ha[s] original jurisdiction, it act[s] squarely within its discretion by declining supplemental jurisdiction over the remaining [state law] claim[s] and dismissing [them] without prejudice"). *Washington v. Miami Cnty*., No. 3:20-CV-173, 2022 WL 17326436, at *15 (S.D. Ohio Nov. 29, 2022).

In the event the Court has misjudged the gravity of damages allegedly inflicted on Defendant by the Indeed.com posting, Defendant is granted until January 14, 2023 to amend its counterclaim to cure the defect in their pleading, assuming they can do so in good faith.

## IV.    Conclusion

Because Plaintiff Michael P. Hollobaugh Sr. resigned his position by announcing that fact to the Ohio Department of Jobs and Family Services and applying for unemployment benefits, Defendant Pohl Transportation, Inc.'s Motion for Summary Judgment, doc. 25, is **GRANTED**. Summary judgement is awarded to Defendant Pohl Transportation, Inc. on Plaintiff Michael P. Hollobaugh Sr.'s claims. Defendant's counterclaims are **DISMISSED WITHOUT PREJUDICE** to amendment. Defendant is given leave to file an amended counterclaim within thirty (30) days from the filing of this Order, in which Defendant may allege facts that would support diversity jurisdiction. Should Defendant fail to file an amended counterclaim within those thirty days, pursuant to 28 U.S.C. § 1367(c)(3), the Court will decline to exercise supplemental jurisdiction over the state law claims raised in the Amended Answer and Counterclaim against Plaintiff Michael P. Hollobaugh Sr. and such claims will be dismissed without prejudice to refiling in a State Court of competent jurisdiction and the matter terminated from the Court's docket.

Defendants have until January 14, 2023, to file a Second Amended Counterclaim consistent with Rule 11.


                                                    s/Thomas M. Rose
                                        _____
                                                 THOMAS M. ROSE
                                        UNITED STATES DISTRICT JUDGE